**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| RAFAEL SUAREZ, DAISY GONZALEZ, and RICHARD BYRD, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NISSAN NORTH AMERICA, INC.,<br><br>Defendant. | Case No.:<br><br><br><br><br>**JURY DEMAND** |

## PLAINTIFFS' CLASS ACTION COMPLAINT

Plaintiffs Rafael Suarez, Daisy Gonzalez, and Richard Byrd ("Plaintiffs") individually and on behalf of all others similarly situated (the "Class" as defined below), by and through their attorneys, allege as follows against Defendant Nissan North America, Inc. ("Nissan").

## INTRODUCTION

1. Plaintiffs bring this class action against Nissan on behalf of themselves and a class of current and former owners and lessees of certain 2013-2018 Nissan Altima vehicles ("Class Members").

2. Plaintiffs allege that the headlamps in '13-'18 Nissan Altimas manufactured with halogen headlamps (the "Class Vehicles") suffer from a defect (the "Defect" or "Headlamp Defect") that causes a reflective surface inside of the headlamp assembly to become dull, which causes the light output from the low beam headlights to becoming progressively dimmer over time. The dimming can become so severe that it presents a significant safety hazard. Many Class

Members report being afraid to drive their Altima at night, and some have reported being pulled over by police due to the dim headlights.

3.     Plaintiffs allege that Nissan has been aware of the Defect since at least 2013, but failed to disclose it to purchasers and lessees.

4.     Moreover, Nissan has refused to provide free replacement headlamps to Class Members. Class Vehicle owners and lessees who take their Altimas to Nissan dealerships are usually charged for costly replacements because remedying the Defect requires replacement of the entire headlamp assembly.

5.     Plaintiffs seek relief both for themselves and for a class of similarly-situated owners or lessees of Class Vehicles.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Nissan is headquartered and regularly transacts business in this district, is subject to personal jurisdiction in this district and, therefore, is deemed to be a citizen of this district. Additionally, Nissan advertised in this district and has received substantial revenue and profits from sales and/or leases of the Class vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

2

8.      This Court has personal jurisdiction over Nissan because it is headquartered in this judicial district, has conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within Tennessee and throughout the United States.

## THE PARTIES

### Plaintiff Daisy Gonzalez (California)

9.      Plaintiff Daisy Gonzalez is a citizen and resident of California.

10.     On or around September 20, 2015, Ms. Gonzalez purchased a certified used 2013 Nissan Altima with approximately 40,000 miles from an authorized Nissan Dealership in California. Prior to her purchase, Ms. Gonzalez researched Altimas online, spoke with her dealer about the vehicle, test drove the vehicle, reviewed the window sticker, and looked at an Altima brochure. Safety and reliability were important factors in her decision, and she would not have purchased the vehicle if the Headlamp Defect had been disclosed.

11.     Ms. Gonzalez also purchased a Platinum level extended warranty.

12.     Ms. Gonzalez purchased her vehicle for personal, family, or household use. Ms. Gonzalez has at all times attempted to use her Class Vehicle in the normal and expected manner.

13.     Nissan never disclosed the Headlamp Defect to Ms. Gonzalez prior to purchase.

14.     Shortly after purchase, Ms. Gonzalez noticed that the low-beam headlights on her vehicle had become dangerously dim.

15.     When she reported the issue to her dealership, the service center refused to perform any repair and claimed there was nothing wrong with her car.

16.     Ms. Gonzalez has continued to complain about the dim headlights during her subsequent visits to the dealership but has received no additional repair or assistance.

3

17.     Ms. Gonzalez is afraid to drive her vehicle at night because the headlights are so dim. She has since been informed that it would cost $900 to have both of her headlamp assemblies replaced at a third-party repair center.

18.     Had Nissan disclosed the Defect, Ms. Gonzalez would not have purchased her Class Vehicle or would have paid significantly less for it.

### Plaintiff Rafael Suarez (Florida)

19.     Plaintiff Rafael Suarez is a citizen and resident of Florida.

20.     On or around July 29, 2015, Mr. Suarez purchased a new 2015 Nissan Altima from an authorized Nissan Dealership in Florida. Prior to his purchase, Mr. Suarez researched Altimas online, spoke with his dealer about the vehicle, test drove the vehicle, reviewed the window sticker, and looked at an Altima brochure. Safety and reliability were important factors in his decision, and he would not have purchased the vehicle if the Headlamp Defect had been disclosed.

21.     Mr. Suarez purchased his vehicle for personal, family, or household use. Mr. Suarez has at all times attempted to use his Class Vehicle in the normal and expected manner.

22.     Nissan never disclosed the Headlamp Defect to Mr. Suarez prior to purchase.

23.     Shortly after purchase, Mr. Suarez began to notice the low-beam headlights were not very bright. They continued to get progressively dimmer over time and by the time Mr. Suarez's vehicle had roughly 30,000-40,000 miles, the headlights were so dim he no longer felt it safe to drive at night.

24.     Mr. Suarez has contacted Nissan several times about the Headlamp Defect and received no assistance. He is aware from online reports that Nissan dealerships simply charge the customer for an expensive replacement of the entire headlamp assembly.

25. Had Nissan disclosed the Defect, Mr. Suarez would not have purchased his Class Vehicle or would have paid significantly less for it.

**Plaintiff Richard Byrd (Ohio)**

26. Plaintiff Richard Byrd is a citizen and resident of Ohio.

27. On or around February 15, 2017, Mr. Byrd purchased a certified used 2015 Nissan Altima with approximately 30,000 from an authorized Nissan Dealership in Ohio. Prior to his purchase, Mr. Byrd researched Altimas online, spoke with his dealer about the vehicle, test drove the vehicle, reviewed the window sticker, and looked at an Altima brochure. Safety and reliability were important factors in his decision, and he would not have purchased the vehicle if the Headlamp Defect had been disclosed.

28. Mr. Byrd also purchased a Gold level extended warranty plan which covers many components of his vehicle, including headlights, for 7 years/100,000 miles.

29. Mr. Byrd purchased his vehicle for personal, family, or household use. Mr. Byrd has at all times attempted to use his Class Vehicle in the normal and expected manner.

30. Nissan never disclosed the Headlamp Defect to Mr. Byrd prior to purchase.

31. The low-beam headlights on Mr. Byrd's Class Vehicle have progressively dimmed over time and by around January 15, 2019, he noticed that he could hardly see the road at night. On at least one occasion, this hazardous condition almost caused an accident. In or around February of 2019, he went back to the dealership and the dealership charged him $230 to replace the bulbs in both headlights, saying his high-end warranty did not cover lightbulb replacements. The replacement bulbs did not fix the problem.

32. Mr. Byrd has continued to complain about the dim headlights during several subsequent visits to the dealership but received no effective repair or assistance.

33.     Eventually, Mr. Byrd elected to pay for Headlamp replacements. He paid a total of $1,223.60 out-of-pocket at a Nissan Dealer in Ohio.

34.     Had Nissan disclosed the Defect, Mr. Byrd would not have purchased his Class Vehicle or would have paid significantly less for it.

**Defendant**

35.     Defendant Nissan North America, Inc. ("Nissan") is a California corporation that is qualified to do, and does, business in the State of Tennessee and in this judicial district. Upon information and belief, Nissan's domestic headquarters is located at One Nissan Way Franklin, Tennessee, 37067.

**FACTUAL ALLEGATIONS**

36.     The Altima is Nissan's flagship mid-sized sedan that competes with cars such as the Toyota Camry and the Honda Accord. Plaintiffs believe, based on publicly available documents, that Nissan sold around 1.8 million '13-'18 Altimas.

37.     The Headlamp Defect does not result from a defect with the light bulbs themselves, but rather from a defect in the headlamp assembly, which is a sealed unit that houses both the low and high beam headlights. For clarity, Figure 1 depicts a typical Altima headlamp assembly:



Figure 1.

38. The Class Vehicles are equipped with a type of headlamp called a projector headlamp. In a projector headlamp, the light bulb is housed within a highly reflective cup or bowl, which reflects the light from the bulb forward through a semi-spherical focusing lens. The reflector cup and lens are housed within the headlamp assembly. Figure 2 shows the semispherical lens, as seen from the outside of the headlamp assembly. Figure 3 shows a reflector cup that has been removed from the headlamp assembly.



Figure 2.



Figure 3.

39.     The Class Vehicles utilize a compact projector headlamp design. It has been well-known for at least a decade within the motor vehicle industry that compact projector headlamps must be carefully manufactured and designed to ensure that the reflector cup is robust enough to withstand heat from the light bulb. Moreover, halogen bulbs generate significantly more heat than other kinds of bulbs, such as Xenon or LED bulbs.

40.     Moreover, it is important that projector headlamps seal out ambient moisture, which, when combined with the heat from the bulb, can cause degradation of surfaces within the headlamp, such as the reflector cup.

41.     Plaintiffs allege that the Class Vehicle headlamps are defective because they are designed and manufactured in a manner that is not sufficiently robust to withstand heat and/or seal out humidity, which causes the reflective surface of the projector cup to burn or "outgas," meaning the reflective coating vaporizes. This outgassing reduces the reflectivity of the coating, causing it to appear "burned" and drastically reducing light output. In addition, the outgassed material can deposit on the lens surface within the headlamp, further degrading headlamp performance. Figure 4 shows a reflector cup where the reflective surface has deteriorated or burned.



Figure 4.

42.     Over time, the dimming often gets so bad that Altima drivers report that they must either drive without being able to see the road, which has resulted in accidents, near accidents, and getting pulled over by police, or else use their high beam lights at all times, which is both illegal and dangerous. Other Altima owners report that they have been forced to stop driving their vehicles at night altogether. There is no question that this defect can result in a safety hazard for Altima owners, other drivers, and pedestrians.

43.     To be clear, this is not haze on the headlamp outer surface due to age, or dimming of the bulb over time due to normal use. Rather, this is a design and manufacturing defect that results in seriously dim and dangerous headlights, often within just a few years. Replacing the bulb does nothing. Moreover, because the headlamp assembly is a sealed unit, it is not possible to simply remove the haze or replace the reflector cup.

44.     A vehicle experiencing the Defect can only be repaired by replacing the entire headlight assembly, which can sometimes cost as much as $1,200 per pair.

45.     Because Class Members are unable to safely operate their vehicles for significant portions of time, the Headlamp Defect causes them to fail of their essential purpose and affects the vehicles' central functionality. No reasonable consumer expects to only be able to drive their car during the daytime.

46.     Nissan, through its authorized dealerships and service centers, has failed to remedy the Defect free of charge.

**B.     Nissan's Knowledge of the Defect**

47.     Plaintiffs' experiences are not isolated or outlier occurrences. Since at least 2013, Class Members have complained to Nissan and Nissan dealers, to the National Highway Traffic

Safety Administration ("NHTSA"), and on message boards, social media, and other websites concerning the Headlamp Defect.

48.     Nissan had a duty to disclose the Defect due to, *inter alia*, its knowledge that the Defect poses a serious safety hazard, the fact that the Defect goes to the central functionality of Class Vehicles, its superior and exclusive knowledge of the Defect, and the fact that the Defect constitutes information reasonable consumers would want to know.

49.     Numerous complaints about the Defect appear on websites Nissan actively monitors, such as NHTSA's website and Nissan owner message boards.[1] Many complaints posted on social media websites such as Facebook and Twitter also tag Nissan in the posts. Although Nissan monitors these forums, it is difficult for potential consumers to do so, giving Nissan exclusive knowledge of the Defect. The following are merely a sampling of the complaints submitted by Class Vehicle owners and lessees which date back to at least 2013:

**Twroy on September 18, 2013**

- "I have a 2013 Nissan Altima which is my second one since I liked my first one so much. This one is awful! The fuel economy terrible and the low beams are horrible. The low beams are so dim and they continue to get worse and worse. The dealership says they have heard this complaint but there is nothing they can do about it. This is definitely a safety concern. It is almost impossible to drive the car at night because the lights are so dim. I have tried all the high end expensive headlamp bulbs. The high beams are great with the same bulb as low beams so it has to be the projection lens which is consistent with all the blogs and stuff I read about them. I have also tried LED and it did not fix the problem. I don't want to buy a aftermarket headlamp because all the ones I see all have the projection lens in them. I don know why Nissan cannot come up with a fix!"

---

[1] Federal law requires automakers like Nissan to be in close contact with NHTSA regarding potential automobile defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act*, Pub. L. No. 106-414, 114 Stat.1800 (2000).

**From Glen Allen, VA on December 31, 2013**

- "Low beam headlights are very dim; makes night driving very difficult; the low beam headlights were not very good even when the car was new and have gotten worse as the car ages"

**Perry F. on January 31, 2014**

- "I am adding my voice to the countless other 2013 Nissan Altima Owners regarding Dim low beam headlights. We noticed soon after we bought the car. We don't drive too often at night and almost always in the city where street lighting and lower speeds makes the problem less critical... but I truly would be nervous driving at night on the highway with this problem. The only workaround solution until a repair of this defect is to drive with your high beams on which is not a great solution as it blinds oncoming drivers. It is very clear from the countless reports from all the car complaints websites about this exact same issue that this is not an isolated incident. What is really scary is that this is TRULY A ROAD SAFETY HAZARD and yet Government agencies have not investigated and forced Nissan to fix the problem as a mandatory recall. I could buy after-market headlight enclosure bodies with working projectors but this would likely be a $700-$1000 repair for something that should be Nissan's problem to address. I could also buy new extremely bright LED bulbs that increase the lumens from the stock 1500 to over 6000 but from what I have read, others have been doing this and because of the default of the projector lens/housing the increased bright lights do not seeming to be solving the problem."

**From North Port, FL on August 1, 2014**

- "Takata recall- the front headlights are so dim, it's almost as if they don't even work. I can barely see in front of me and I have to use the brights if I am driving to even see a little bit. This car is totally unsafe to drive! this should have been recalled already and Nissan needs to address this issue! I have seen numerous complaints about the same issue and nothing is being done. Safety hazard by far!!!"

**From Reading, PA on October 11, 2014**

- "Highlights are dangerously dim. I luckily have fog lights to help but the headlights had gotten me pulled over for being so dim. Luckily the officer let me off with a warning to just get it replaced. I had already replaced the headlights once before when they had gotten dim at about 40kmiles with hid and now I realized they are dim again. I drive a lot so I just realized at 113K miles how dim they were when the officer had pulled me over."

**From Toa Alta, PR on October 13, 2014**

- "October 31, 2014 The low beam headlights are entirely inadequate to provide sufficient lighting intensity and failed to safely illuminate the street ahead of you. This creates a very dangerous situation when driving at night, while raining, or under any low visibility conditions since you are not able to see objects, even worst, pedestrians in the path of travel. This issue has been present since I bought the car (brand new), but became a real serious and safety hazard between 15K-20K miles. Unfortunately, I have to constantly drive with the high beams at night leaving other drivers with a partial blindness; which I consider it unfair and unsafe, too. Sometimes, when I switch to low for an oncoming vehicle, I suddenly find myself driving completely without sufficient light. My eyes become partially blind due to the change in light intensity. As a safety professional in the aviation industry, I hope that Nissan and NHTSA do something sooner, because tomorrow might be too late."

**From Marysville, WA on January 1, 2015**

- "January 1, 2015 My 2013 Nissan Altima has dangeroulsy dim headlights. I have changed the bulbs 4 times now and there is no change. We took it to a Nissan dealership, the technician said that it is a known manufacturing defect and he recommended led bulbs. I changed the bulbs again to led ones and nothing changed. I cannot see more than a car length in front of my car at night. When a car is behind me with real headlights, it throws a shadow and makes it more difficult to see in front of the car. I cannot see where I am turning and I am afraid I am going to hit a pedestrian or run off the road because of such poor visibilty from the dim headlights. Nissan is aware of this defect. I have read complaints from many other Altima drivers who have the same dangerous issue. There is a defective reflective film in the light projector that peels and doesn't project the lights correctly. This isn't a warranty issue, it is a safety issue. The technician said there is no "fix" for this issue without changing out the whole assembly. Very dangerous driving at highway speeds with only a carlength of light in front and none to the sides. This should be a recall because of the danger it poses to drivers and other on the roads. It is a known defect."

**NHTSA Complaint 10555045 on December 6, 2013 (Incident date March 17, 2013)**

- "THE CONTACT OWNS A 2013 NISSAN ALTIMA. THE CONTACT STATED THAT WHILE DRIVING VARIOUS SPEEDS, THE DRIVER AND PASSENGER SIDE FRONT HEADLIGHTS BECAME ABNORMALLY DIM. THE FAILURE AFFECTED THE CONTACT'S VISIBILITY OF THE ROADWAY WHEN DRIVING AT NIGHT. THE VEHICLE WAS TAKEN TO A DEALER WHERE THE TECHNICIAN DIAGNOSED THAT THE FAILURE WAS CAUSED BY A MANUFACTURING DEFECT AND ALL OF THE 2013 ALTIMA MODELS HAD THE SAME ISSUE. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE PROBLEM. THE APPROXIMATE FAILURE MILEAGE WAS 10.

**NHTSA Complaint 10575127 on March 27, 2014 (Incident date June 12, 2013)**

- "THE CONTACT OWNS A 2013 NISSAN ALTIMA. THE CONTACT STATED THAT HE STARTED THE VEHICLE AND THE PASSENGER SIDE AIR BAG ILLUMINATED. THE CONTACT ALSO STATED THAT THE HEADLIGHTS WERE VERY LOW, HE WAS UNABLE TO SEE THE ROAD AT NIGHT AND HAD TO ACTIVATE THE HIGH BEAM HEADLIGHTS. THE BRAKE WARNING LIGHT ILLUMINATED ON THE INSTRUMENT PANEL WHILE DRIVING 30 MPH. THE VEHICLE WAS TAKEN TO THE DEALER. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURES. THE FAILURE MILEAGE WAS 5,000. UPDATED 05/28/14 MA THE CONSUMER STATED THE BRAKE WARNING LIGHT ILLUMINATED AT 45MPH AND THEN AGAIN AT 30MPH. THE PASSENGER AIR BAG LIGHT ILLUMINATED ON TWO SEPARATE OCCASIONS PRIOR TO A PASSENGER SITTING IN THE SEAT. THE HEADLIGHTS IMPROVED SINCE REPLACING THE BULBS WITH 110 W, AFTERMARKET BULBS. THE SEAT BELT LIGHT ILLUMINATED ON 3 SEPARATE OCCASIONS. THE VEHICLE HAD TO BE RESTARTED. UPDATED 05/30/2014"

**NHTSA Complaint 10584937 on April 25, 2014 (Incident Date December 29, 2012)**

- "THE LOW-BEAM HEADLIGHTS ON MY 2013 ALTIMA SV WITH 2.5 ENGINE, DO NOT THROW LIGHT DOWN THE ROAD FAR ENOUGH. I NOW REFUSE TO DRIVE THE CAR AT INTERSTATE SPEEDS AT NIGHT...OR WHEN THERE IS FOG OR HEAVY RAIN. I TESTED MY OBSERVATION BY PARKING MY 2006 TOYOTA CAMRY BESIDE THE NISSAN ALTIMA AND TURNING BOTH LIGHTS ON LOW BEAM. THE ALTIMA'S THROW IS DRAMATICALLY LESS THAN THE ALTIMA'S. I FEEL QUITE SAFE DRIVING THE CAMRY AT NIGHT AT INTERSTATE SPEEDS. MY SERVICE WRITER AND SERVICE MANAGER AND ORIGINAL SALES PERSON HAVE REPEATEDLY ALREADY EXPLAINED THAT THERE IS NO PROBLEM WITH THE HEADLIGHTS AND THERE IS NOTHING THAT CAN BE DONE. I REJECT THE STATEMENTS OF ALL WHO REPRESENT NISSAN."

**From Columbia, MD on February 22, 2015**

- "1) THE LOW BEAM HEADLIGHTS ARE ENTIRELY INADEQUATE TO PROVIDE SUFFICIENT LIGHTING INTENSITY AND DISTANCE. THE LIGHTS BARELY ILLUMINATE ABOUT 2 CAR LENGTHS AHEAD, WHICH IS TOO SHORT A DISTANCE AT SPEEDS ABOVE 25-30MPH, MAKING HIGHWAY TRAVEL AT NIGHT VERY DANGEROUS. OBJECTS IN THE PATH OF TRAVEL AND ON THE SIDE OF THE ROAD ARE NOT VISIBLE IN TIME TO SAFELY RESPOND. STREET SIGNS AND TURNS ARE NEARLY IMPOSSIBLE TO IDENTIFY IF THEY ARE NOT NEAR STREET LIGHTS. THIS ISSUE HAS BEEN PRESENT SINCE BUYING THE CAR, WHICH HAS BEEN TO THE DEALER MULTIPLE TIMES FOR ADJUSTMENT, BUT THEY INSIST THAT THE LIGHTS ARE SET WITHIN SPECS. THE HIGH BEAMS PROVIDE EXCELLENT LIGHTING, BUT WHEN SWITCHED TO LOW FOR AN ONCOMING VEHICLE,

14

I AM SUDDENLY DRIVING WITHOUT SUFFICIENT LIGHT. THIS IS SUCH A FRIGHTENING PROBLEM THAT I PREFER NOT TO DRIVE THIS CAR AT NIGHT. I CAN'T BELIEVE THAT THESE LIGHTS MEET SAFETY STANDARDS…"

**Jagger on May 1, 2016**

- "I've owned two 2013 Nissan Altima sedans and both have terrible headlights. I can't see anything at night even after replacing bulbs on two occasions. I have to use the high beam to drive at night. Is anything being done. This is very dangerous. I bought the vehicle in 2015 with 48,500 miles and it now sits on 100k and the lights seem to have gotten a lot worse. It doesn't even look like the headlights are on at nights even in places with no light posts. I have to continually turn my high beams in order to see. This is extremely dangerous and frustrating that nothing is being done to remedy this. I talked to my dealership and was advised that the headlights are only covered during the first 36K miles.I seriously hope that Nissan losses a lot of business even with the newly 2019 model. Their vehicles are awful."

**Jonette on October 27, 2016**

- "Headlights were never as bright as other vehicles and gradually dimmed. We have replaced a couple times with quality bulbs, but they dim again. It is dangerous. I have not yet had an accident, but have to drive extra slow and cautious. At times I have wondered if my eyesight was failing and then have been reassured by others it is the headlights. Interested in any helpful hints. I do love my car, just not driving at night because of headlights - wet and dark are the worse.(I did hit a deer with the car the night I brought it home - my husband now suspects that even that day the lights were not as bright as the should have been)."

**Anna D. on April 1, 2017**

- "I began to have trouble with the low beam vision on my vehicle last year when I moved to a town that requires driving about an hour in very dark conditions at night (no street lights etc). A driver in front of my mentioned, after we parked and chatted, that my lights were very dim and the one on the passenger side was almost too dim to see. When I went to the Nissan dealer where I purchased the vehicle for a recent maintenance, oil change, tire rotation, etc., I asked them to check the dim lights and told them the problem I was having at night. The service manager came back when maintenance was complete and said that he had 4 individuals "look" at the lights and there was nothing wrong with them.I have contacted an independent body shop and gotten an estimate to replace the unit (he said it comes as a unit, cannot just replace low beam bulbs) and quoted a $600 install fee. He suggested that he could possibly polish the bulb, but I doubt that is going to work and they get sued they'll probably pay attention then and do a recall. If Nissan is as reputable as they claim, they should be willing to stand behind their vehicle and fix this very serious problem."

**From Andover, MA on May 15, 2017**

- "About 1.5 years ago, I noticed my driver's side headlight suddenly become dim, a few weeks later, the same with the pax light. It made it difficult to see at night to the point I was driving with high beams. I went to get the required rejected sticker for the car and was rejected due to the lights. After replacing the bulbs twice with 2 separate mechanics, still no appropriate lighting & a second sticker rejection. I was quoted by 2 separate mechanics between $850-1000 to replace both of the lighting units with aftermarket parts and I just do not have that money to give. I recently discovered that there are others with this same problem so, seems that it is a manufacturer's defect. I called Nissan today to ask about a recall but, there isn't one. I asked for Nissan to pay for the replacements & was told that they would call me back after assessing the year, mileage, repair history, etc...locally, I only drive locally because I've been driving virtually blindly and illegally for 1+ year now frustrated to not have a solution. I hope that Nissan will recognize the issue and pay for the repair."

**From Wideman, AR on September 1, 2018**

- "The dim lights are so weak that I can not see as much as a foot in front of my vehicle at night time., when driving at night I have to drive with high beems on at all times. I work night shift and need the dim lights when meeting someone on the highways. When researching this problem, I see many people with the same complaints and yet Nissan will not look into the defects of the headlamp assemblies that they are using. It is said that the projectors have been burning out causing dim lights no to work and the cost to fix is greater than 1200. With Nissan."

**Albert F. on October 4, 2018**

- "I drive 100 miles each day/night. I have been noticing that the headlights seem dim. My wife has been complaining for months about it. Last night I could not see anything in front of me and drove with my high beams. I brought the car to the dealer thinking the bulbs needed to be replaced. These are my originals. The dealer inspected and said it is not the bulb but the lens. My lens are cloudy and they seem to be burned or damaged. This is the same for both lights. I asked if this was normal and they said NO. I asked the cost to fix it and they laugh knowing it would be expensive. They looked up the parts and gave me a discount at $1,100. They said the only fix is to replace the entire assembly. I freaked out. Who expects to buy a car and when it's time to change the bulb to actually change the entire assembly!! I called Consumer Affairs at Nissan, received a case number, and was told someone will call you. I received the call with a pleasant response, "we have reviewed your case and we are sorry to inform you that this is no longer covered under your warranty". I explained this is a manufacture defect and not a warranty issue. Who expects to replace the assembly before the bulbs go out!! This is such BS and a large corporation like Nissan doesn't care because we don't do

anything about it. Protest these jerks and it seem many of us have the same issue so it is a problem. How do we get this fixed? I don't mind making repairs but this is absurd!"

**From Lonoke, AR on January 11, 2019**

- "The low beam headlights on our 2014 Nissan Altima are so dim you can barely see. I changed the bulbs out to a brighter aftermarket led bulb and the difference is minimal at best. The high beams are still very bright but they are not the projection style. In order to be able to see at night when there is oncoming traffic I must keep the fog lights onto light up the road. The illumination is so poor that security lights that are over people's driveways are brighter than the headlights and driving at night in the rain is basically impossible on low beam. I've talked to a Nissan mechanic and he said the only true fix will be to replace the entire headlight assembly because their are issues with the materials breaking down inside the projector portion of the headlight assembly. If that's the case Nissan has done a poor job of designing their headlight assembly and should replace them at their cost as this is a very real hazard. After speaking to the mechanic I started looking online and have found this isn't an isolated issue, evidently it's all Altima from 2013-2015 that are experiencing this problem."

**From Oklahoma City on February 8, 2019**

- "Driver side headlight is dim. Changing the bulb doesn't help. The projector inside the housing goes bad prematurely and the headlight must be replaced as a whole. I had this car brand new and it's well taken care of. It has 82K miles on it. My wife was pulled over because of this. Nissan will not help."

**NHTSA Complaint 11181518 on February 21, 2019**

- "MY HEADLIGHTS ARE EXTREMELY DANGEROUS AND I CAN'T BELIEVE THERE HASN'T BEEN A RECALL YET. THESE THINGS CAN'T LIGHT UP MORE THAN 5-10FT IN FRONT OF YOU AT NIGHT. I HAVE BECOME A RIDESHARE DRIVER AND THIS IS UNACCEPTABLE. COMPLETELY UNACCEPTABLE IF YOU ASK ME. I HAVE TO USE THE HIGH BEAMS WHENEVER DRIVING IN A NON-LIT AREA WHICH AFFECTS ONCOMING TRAFFIC REGULARLY. I HAVE REPLACED BULBS MULTIPLE TIMES, UPGRADING TO THE BEST LIGHTS EACH TIME AND TO NO EFFECT. WHAT'S IT GONNA TAKE??? DEATH BEFORE THIS ISSUE BECOMES A PROBLEM TO YOU PEOPLE?? SICKENING IS WHAT IT IS. I DON'T HAVE $1000 TO FIX ON MY OWN AND IF I DID I STILL WOULDN'T. PLEASE RECALL VEHICLE IMMEDIATELY BEFORE I KILL PEOPLE"

**NHTSA Complaint 11186690, on March 13, 2019**

- "THE HEADLIGHTS ON THIS VEHICLE HAVE ALWAYS SUPPLIED POOR LIGHTING AND IT HAS GOTTEN WORSE EACH YEAR TO THE POINT NOW

IT IS A SAFETY HAZARD WHEN DRIVING AT NIGHT. WE HAVE EVEN TRIED REPLACING THE BULBS AT OUR OWN EXPENSE WITH BRIGHTER ONES BUT IT DOES NOT HELP. ACCORDING TO STANHOPE NISSAN IT IS A COMMON COMPLAINT WITH THIS VEHICLE AND IT CAN ONLY BE RESOLVED BY REPLACING THE HEADLIGHT ASSEMBLIES WHICH WOULD COST OVER $1000. WE HAVE AN EXTENDED WARRANTY BUT IT DOES NOT COVER IT. I TRIED CONTACTING NISSAN WITH THIS ISSUE AND THEY DON'T CARE. THIS IS A SAFETY ISSUE AND THERE SHOULD BE A RECALL, PERIOD."

**NHTSA Complaint 11189876 on March 19, 2019**

- "THE LOW BEAM HEADLIGHTS DO NOT PROJECT ENOUGH LIGHT TO DRIVE SAFELY AT NIGHT. THIS ISSUE HAS GOTTEN WORSE OVER TIME FORCING THE CONSTANT USE OF HIGH BEAMS IN ORDER TO DRIVE AFTER DARK. DRIVING WITH LOW BEAMS CREATES A SAFETY ISSUE BECAUSE THE LOW BEAMS ONLY ILLUMINATE ABOUT A CAR LENGTH AND DRIVING CONSTANTLY WITH HIGH BEAMS ALSO CREATES A SAFETY HAZARD. I REPLACED THE BULBS 3 TIMES IN 3 MONTHS CHOOSING BRIGHTER BULBS EACH TIME, AS WELL AS BUYING FACTORY BULBS FROM THE NISSAN DEALER, BUT NOTHING CHANGED."

**From a 2013 Nissan Altima owner on October 1, 2019**

- "The headlights were never strong. They are now weaker than street lights or virtually any other car around me. Cars behind me case a shadow of my car where my beams should be. It's like driving with daytime running lights. My internet search shows this is a widespread problem with the 2013 Altima. This is an extremely serious safety problem and I would like to know if this has been or will be investigated by NHTSA. At a minimum, Nissan should repair the affected cars."

**From a 2013 Nissan Altima owner on February 1, 2020**

- "Front headlights do not project out enough to be able to farther when driving causing a huge risk of an accident especially when you don't know the roads , you are not able to see what is ahead of you unlike other vehicles do, and when it rains it looks like you don't have your head lights on so you I have to drive with my high beams on and when passing other vehicles I have to shut the high beams off and I cannot see the road , I have gone off the road and almost crashed due to not being able to see , this is a huge problem for this I have owned a 2011 Nissan Altima and did not have this problem what so ever , there are so many complaints ,."

**From a 2013 Nissan Altima owner on March 5, 2020**

- "The front low beam regular headlights are way too dim now, there's barely any illumination. My wife was just pulled over last night as the officer thought she had her lights off. It's been this way for a while and so many people online are reporting the same problem. The bulbs themselves are just fine. It appears to be the reflective coating in the projector housing that burns off and then it basically stops projecting any light out. Very dangerous and now getting pulled over. This really should be a recall as you can barely see at night."

50.     As the foregoing complaints demonstrate, driver experiences with dimming headlights were not isolated incidents. As of the date of this filing, NHTSA's website contains 1890 complaints concerning the 2013 Nissan Altima; 789 complaints concerning the 2014 Nissan Altima; 543 complaints concerning the 2015 Nissan Altima; 284 complaints concerning the 2016 Nissan Altima; 144 complaints concerning the 2017 Nissan Altima; and 109 complaints concerning the 2018 Nissan Altima. These complaints for each model year include grievances about the Headlamp Defect, with a substantial number of complaints concerning the Headlamp Defect comprising the complaints for the 2013-2015 model years.

51.     Complaints concerning the Headlamp Defect in the 2013 Nissan Altima started to emerge on NHTSA's website around December of 2013 and continue up through December 2020. One such complaint dated December 6, 2013 references an incident date of March 17, 2013 wherein the "driver and passenger side front headlights became abnormally dim" which "affected the contact's visibility of the roadway when driving at night." According to this complainant, a service technician at the dealership "diagnosed that the failure was caused by a manufacturing defect and all of the 2013 Altima Models had the same issue." The complainant also indicated that "[t]he manufacturer was made aware of the problem" and the "approximate failure mileage was 10."

52.     Most drivers complain of this being an "ongoing issue" that gets "progressively worse" over time until the parts are replaced.[2] For some car owners, the cost to repair or replace the Headlamp Assemblies is prohibitive, with some drivers quoted at a repair cost of $1,000 or more.[3] Drivers reported experiencing the Headlamp Defect even after replacing the bulbs and being forced to resort to using their high beams to be able to see while driving at night.[4] One driver deemed the headlights "useless on low beam" and likened it to "driving with flashlights taped to the car."[5]

53.     In addition to being on notice of the Headlamp Defect through NHTSA and other online complaints which date back to at least 2013, Nissan also directly learned of the widespread headlight problems from its network of dealerships. Many of the customers who wrote online or to Nissan about their bad experiences with the Defect report having taken their Class Vehicles into Nissan dealerships because of the Defect. Upon information and belief, Nissan began to see complaints related to the Defect through its dealers as early as 2012 or 2013 when it began selling the 2013 model-year Class Vehicles.

54.     Confirming its knowledge and concealment of the Defect, Nissan and its dealerships often tell drivers that there is nothing wrong with their vehicles, even when the headlights are so dim Class Vehicle owners are unable to drive at night.

---

[2] *See, e.g.*,
https://www.nhtsa.gov/vehicle/2013/NISSAN/ALTIMA/4%252520DR/FWD#complaints;
https://www.nhtsa.gov/vehicle/2014/NISSAN/ALTIMA/4%252520DR/FWD#complaints.

[3] *See, e.g.*,
https://www.nhtsa.gov/vehicle/2013/NISSAN/ALTIMA/4%252520DR/FWD#complaints;
https://www.nhtsa.gov/vehicle/2014/NISSAN/ALTIMA/4%252520DR/FWD#complaints.

[4] *See, e.g.*,
https://www.nhtsa.gov/vehicle/2013/NISSAN/ALTIMA/4%252520DR/FWD#complaints.

[5] *See* https://www.nhtsa.gov/vehicle/2014/NISSAN/ALTIMA/4%252520DR/FWD#complaints.

55.     Despite its knowledge of the Headlamp Defect, Nissan failed to disclose it to Plaintiffs and other Class Members. Nissan could have provided Class Vehicle owners and lessees with adequate and satisfactory notice of the Defect, including through its network of dealers, in owners' manuals, on its website, in Class Vehicle brochures, and on Class Vehicle Monroney stickers. Had Nissan disclosed the Defect in any of these places, reasonable consumers would have been aware of it.

56.     The Headlamp Defect first manifested in the 2013 Nissan Altima.   Despite receiving complaints from drivers of these vehicles, Nissan continued to design, manufacture, and sell five additional model years of Altimas with the same defective headlamps without informing prospective buyers about the Defect.

57.     As a consequence of Nissan's action and inaction, Class Vehicle owners have been deprived of the benefit of their bargain, subjected to hazardous driving conditions, loss of use of their vehicles for significant periods of time, and incurred lost time and out-of-pocket costs from dealership visits and increased maintenance costs. Class Vehicles also have suffered a diminution in value due to the Defect.

58.     Had Plaintiffs and Class Members known about the Defect, they would not have purchased or leased their Class Vehicles or would have paid significantly less in doing so.

**TOLLING OF STATUTES OF LIMITATIONS**

59.     Because the Headlamp Defect cannot be detected until it manifests, Plaintiffs and Class Members were not reasonably able to discover the problem until after purchasing or leasing their Class Vehicles, despite exercising due diligence.

60.     Plaintiffs and Class Members had no realistic ability to discover that the headlamps were defective until they prematurely failed or began exhibiting significant dimness

and would have no reason to believe that the issues they were experiencing were caused by a widespread, systemic defect. Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and Class Members.

61.     As alleged herein, Nissan has known about the Headlamp Defect since at least 2013 and has failed to disclose and actively concealed the existence of the Defect to consumers. Therefore, equitable tolling of statute of limitations is also applicable to the claims Plaintiffs and the Class Members assert against Nissan.

## CLASS ACTION ALLEGATIONS

62.     This action is brought and may be maintained as a class action, pursuant to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure.

63.     The Class is defined as follows:

> All persons in the United States who bought or leased, other than for resale, a 2013-2018 Nissan Altima manufactured with halogen headlamps.

64.     In addition, or in the alternative, State Subclasses are defined as follows:

> **California Subclass**
> All persons in the state of California who bought or leased, other than for resale, a Class Vehicle.
>
> **Florida Subclass**
> All persons in the state of Florida who bought or leased, other than for resale, a Class Vehicle.
>
> **Ohio Subclass**
> All persons in the state of Ohio who bought or leased, other than for resale, a Class Vehicle.

65.     Plaintiffs reserve the right to modify, change, or expand the class definitions when seeking class certification.

66.     **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is

unknown at this time, as such information is in the sole possession of Nissan and is obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that at least hundreds of thousands of Class Vehicles have been sold and leased nationwide. Members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, and dealership records and files) maintained by Nissan in connection with its sale and lease of Class Vehicles.

67. **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

      a.     whether Nissan engaged in the conduct alleged herein;

      b.     whether Class Vehicles are defective;

      c.     whether Nissan placed Class Vehicles into the stream of commerce in the United States with knowledge of the Defect;

      d.     whether Nissan knew or should have known of the Defect, and if so, for how long;

      e.     when Nissan became aware of the Defect in the Class Vehicles;

      f.     whether Nissan knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

      g.     whether Nissan's conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

      h.     whether a reasonable consumer would have considered the Defect to be important when deciding whether to purchase or lease a Class Vehicle;

i.      whether Nissan had a duty to disclose the Defect to Plaintiffs and other Class Members;

j.      whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect;

k.      whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;

l.      whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of Nissan's conduct alleged herein, and if so, the amount or proper measure of those damages; and

m.      whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

68.     **Typicality**: Plaintiffs' claims are typical of the claims of the Class because the Plaintiffs purchased or leased a Class Vehicle containing the Defect, as did each member of the Class. Plaintiffs and Class Members were economically injured in the same manner by Nissan's uniform course of conduct alleged herein. Plaintiffs and Class Members have the same or similar claims against Nissan relating to the conduct alleged herein, and the same conduct on the part of Nissan gives rise to all the claims for relief.

69.     **Adequacy**: Plaintiffs are adequate representatives of the Class, whose interests do not conflict with those of any other Class Member. Plaintiffs have retained counsel competent and experienced in complex class action litigation—including consumer fraud and automobile defect class actions—who intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

70.     **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including from the need for expert witness testimony on the technical and economic aspects of the case. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

71.     **Injunctive Relief**: Nissan has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

72.     **Application of California Law to the Nationwide Class**:  The Court properly can apply California law to all of the claims and issues asserted herein on behalf of the Nationwide Class because Nissan is incorporated in California, Nissan conducts substantial vehicle design operations and research and development in California, and, upon information and belief, Nissan imported many, if not most, of the Class Vehicles through California.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750–1785**
**Plaintiff Gonzalez Individually and on Behalf of Members of the Nationwide Class and, Alternatively, the California Subclass, Who Purchased or Leased a Class Vehicle for Personal Use**

73.     Plaintiff Gonzalez incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

74.     Plaintiff Gonzalez brings this claim individually and on behalf of the Nationwide Class and, alternatively, the California Subclass members who purchased or leased a vehicle for personal, family, or household use.

75.     Plaintiff Gonzalez and the members of the Nationwide Class and California Subclass are "consumers" as defined under the CLRA. *See* Cal. Civ. Code § 1761(d).

76.     Nissan is a "person" as defined under the CLRA. *See* Cal. Civ. Code § 1761(c).

77.     Class Vehicles are "goods" as defined under the CLRA. *See* Cal. Civ. Code § 1761(a).

78.     The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

79.     Nissan engaged in unfair and deceptive acts in violation of the CLRA by the practices described above and by knowingly and intentionally concealing from Plaintiff and the Nationwide Class and California Subclass members that the Class Vehicles suffer from the Headlamp Defect (and the costs, risks, and diminished value of the Class Vehicles as a result of this Defect). Nissan's conduct violated at least the following enumerated CLRA provisions:

     a.    Nissan represented that the Class Vehicles have characteristics, uses, or benefits that they do not have, which is in violation of section 1770(a)(5);

     b.    Nissan represented that the Class Vehicles are of a particular standard, quality, or grade when, in fact, they are not, which is in violation of section 1770(a)(7);

     c.    Nissan advertised its Class Vehicles with the intent not to sell them as advertised, which is in violation of section 1770(a)(9);

d.      Nissan represented that its Class Vehicles have been supplied in accordance with a previous representation when they have not, which is in violation of section 1770(a)(16); and

e.      Nissan inserted an unconscionable provision into its warranty in violation of section 1770(a)(19).

80.      Nissan's unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and created a serious safety hazard for the public.

81.      Nissan knew, should have known, or was reckless in not knowing that the Class Vehicles were defective, posed a safety hazard, would fail prematurely, and were not suitable for their intended use.

82.      Nissan was under a duty to Plaintiff and the Nationwide Class and California Subclass members to disclose the defective nature of the Class Vehicles and the Defect because:

a.      Nissan knew of but actively concealed the Defect from Plaintiff and the Nationwide Class and California Subclass;

b.      Nissan was in a superior and exclusive position to know the true facts about the Defect, which poses serious safety hazards and affects the central functionality of the vehicle, and Plaintiff and the Nationwide Class and California Subclass members could not reasonably have been expected to discover that the Class Vehicles contained the Defect until it manifested, which Nissan knew; and

c.      Nissan made partial representations regarding the reliability, safety, and quality but suppressed facts regarding the Defect.

83.      The facts that Nissan misrepresented to and concealed from Plaintiff and the other Nationwide Class and California Subclass members are material because a reasonable consumer would have considered them to be important in deciding whether to purchase their Class Vehicles or pay a lesser price for them.

84.     The Defect poses a serious safety hazard and affects the central functionality because Class Vehicles cannot be safely driven at night.

85.     In failing to disclose the material Defect, Nissan has knowingly and intentionally concealed material facts in breach of its duty to disclose.

86.     Plaintiff Gonzalez and the Nationwide Class and California Subclass have suffered injury in fact and actual damages resulting from Nissan's material misrepresentations and omissions, including by paying an inflated purchase price for their Class Vehicles and incurring additional out-of-pocket expenses to deal with the Defect. Had Plaintiff Gonzalez and the Nationwide Class and California Subclass members known about the defective nature of the Class Vehicles and the Defect, they would not have purchased or leased their Class Vehicles or would have paid less in doing so.

87.     As a direct and proximate result of Nissan's unfair and deceptive conduct, therefore, Plaintiff and the Nationwide Class and California Subclass members have been harmed.

88.     Pursuant to Cal. Civ. Code § 1782(a), more than 30 days prior to filing this lawsuit Plaintiff Gonzalez sent a demand letter to Nissan notifying it of its CLRA violations and providing it with an opportunity to correct its business practices.

89.     Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs Gonzalez, individually and on behalf of the Nationwide Class and California Subclass, seeks injunctive relief for Nissan's violation of the CLRA.

90.     Additionally, pursuant to Cal. Civ. Code §§ 1780 and 1781, Plaintiff Gonzalez, individually and on behalf of the Nationwide Class and California Subclass, seek compensatory and punitive damages under the CLRA and to recover attorneys' fees and costs.

91.    Plaintiff's CLRA venue declaration is attached as Exhibit 1 to this complaint in accordance with Cal. Civ. Code § 1780(d).

**COUNT II**
**Violations of the California Unfair Competitions Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200–17210**
**Plaintiff Gonzalez, Individually and on Behalf of the Nationwide Class and, Alternatively, California Subclass**

92.    Plaintiff Gonzalez incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

93.    Plaintiff Gonzalez brings this claim individually and on behalf of the Nationwide Class and California Subclass.

94.    The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Nissan's conduct violates each of these prohibitions.

**Unlawful Conduct**

95.    Nissan's conduct is unlawful, in violation of the UCL, because, as set forth herein, it violates the Song–Beverly Consumer Warranty Act, the MMWA, and the CLRA.

**Unfair Conduct**

96.    Nissan's conduct is unfair because it violated California public policy, legislatively declared in the Song–Beverly Consumer Warranty Act, which requires a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes. The Defect renders the Class Vehicles unsafe, unreliable, and inoperable.

97.    Nissan acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following respects:

   a.    Knowingly selling Plaintiff Gonzalez and Nationwide Class and California Subclass members Class Vehicles with the Defect;

b.     Directing and furnishing replacement parts it knew would not adequately remedy the defect, and repairing defective parts with more defective parts and otherwise failing to adequately remedy the Defect during the warranty period;

c.     Refusing to repair or replace the Class Vehicles when the known Defect manifested outside the warranty period;

d.     Failing to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and

e.     Failing to acknowledge the scope and severity of the Defect, which poses serious safety concerns, refusing to acknowledge the Class Vehicles are defective, and failing to provide adequate relief.

98.     The gravity of the harm resulting from Nissan's unfair conduct outweighs any potential utility of the conduct. The practice of selling defective Class Vehicles without providing an adequate remedy to cure the Defect harms the public at large and is part of a common and uniform course of wrongful conduct.

99.     There are reasonably available alternatives that would further Nissan's business interests of increasing sales and preventing false warranty claims. For example, Nissan could have: (a) acknowledged the Defect and provided a permanent, effective fix for the Defect; and/or (b) disclosed the Defect prior to prospective consumers' purchases.

100.     The harm from Nissan's unfair conduct was not reasonably avoidable by consumers. The Class Vehicles all suffer from the latent Defect, and Nissan has failed to disclose it. Plaintiff and Nationwide Class and California Subclass members did not know of, and had no reasonable means of discovering, the Defect.

**Fraudulent Conduct**

101.     Nissan's conduct is fraudulent in violation of the UCL. Nissan's fraudulent acts include knowingly and intentionally concealing from Plaintiff and the Nationwide Class and

California Subclass members the existence of the Defect and falsely marketing and misrepresenting the Class Vehicles as being functional, reliable and safe.

102.     Nissan's misrepresentations and omissions alleged herein caused Plaintiff and the Nationwide Class and California Subclass members to purchase or lease their Class Vehicles or pay more than they would have had Nissan disclosed the Defect.

103.     At all relevant times, Nissan had a duty to disclose the Defect because it had superior and exclusive knowledge of the Defect, which affects the central functionality of the vehicle and creates a safety risk for drivers and passengers, and because Nissan made partial representations about the reliability, quality, and safety of the Class Vehicles but failed to fully disclose the Defect.

104.     Accordingly, Plaintiff Gonzalez and Nationwide Class and California Subclass members have suffered injury in fact, including lost money or property, as a result of Nissan's unlawful, unfair, and fraudulent acts. Absent these acts, Plaintiff Gonzalez and Nationwide Class and California Subclass members would not have purchased or lease their Class Vehicles at the prices they paid or would not have purchased or leased them at all.

105.     Plaintiff Gonzalez seeks appropriate relief under the UCL, including such orders as may be necessary: (a) to enjoin Nissan from continuing its unlawful, unfair, and fraudulent acts or practices, and (b) to restore Plaintiff and Nationwide Class and California Subclass members any money Nissan acquired by its unfair competition, including restitution. Plaintiff also seeks reasonable attorneys' fees and expenses under applicable law.

### COUNT III
**Violations of the Magnuson–Moss Warranty Act ("MMWA")**
**15 U.S.C. §§ 2301–2312**
**All Plaintiffs, Individually and on Behalf of the Nationwide Class**

31

106.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

107.     Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

108.     Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

109.     Nissan is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

110.     The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

111.     15 U.S.C. § 2310(d) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

112.     Nissan's express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under the MMWA, 15 U.S.C. § 2301(7).

113.     Nissan breached its express and implied warranties as described in more detail above. Without limitation, the Class Vehicles contain the Defect that poses a serious safety hazard which renders the vehicles unfit for their intended use and unsafe.

114.     Plaintiffs and the other Nationwide Class Members have had sufficient direct dealings with either Nissan or its agents (e.g., dealerships) to establish privity of contract between Nissan on the one hand and Plaintiffs and each Nationwide Class Member on the other hand. Regardless, privity is not required here because Plaintiffs and each of the Nationwide Class Members are intended third-party beneficiaries of contracts between Nissan and its dealers, and specifically of Nissan's implied warranties. The dealers were not intended to be the ultimate

consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit consumer end-users only.

115.     Plaintiffs and Nationwide Class Members have afforded Nissan a reasonable opportunity to cure its breach of written warranties, and any further opportunity would be unnecessary and futile here as Nissan has failed to remedy the Defect.

116.     At the time of sale or lease of each Class Vehicle, Nissan knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but it nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure under the MMWA and/or afford Nissan a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

117.     Plaintiffs and the Nationwide Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Nissan is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Nationwide Class Members have not re-accepted their Class Vehicles by retaining them.

118.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

119.     Plaintiffs individually and on behalf of the other Class Members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

**COUNT IV**
**Breach of Express Warranty**
**Plaintiffs, Individually and on Behalf of the State Subclasses**

120.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

121.     Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective state subclasses.

122.     Nissan is a "merchant" as defined under the Uniform Commercial Code (UCC).

123.     The Class Vehicles are "goods" as defined under the UCC.

124.     Nissan provided a New Vehicle Limited Warranty that expressly warranted Nissan would repair any defects in materials or workmanship free of charge during the applicable warranty periods. Nissan offers similar warranties on certified used Nissans and extended warranties for both new and used vehicles.

125.     Nissan breached its warranty by failing to provide an adequate repair when Plaintiffs and the State Subclass Members presented their Class Vehicles to authorized Nissan dealers following manifestation of the Defect.

126.     The warranty formed the basis of the bargain that was reached when Plaintiffs and State Subclass Members purchased or leased their Class Vehicles.

127.     Many Plaintiffs and State Subclass Members experienced the Defect within a warranty period. Despite the existence of the express warranty and multiple repair attempts, Nissan failed to inform Plaintiffs and State Subclass Members of the Defect and failed to adequately repair the Defect.

128.     As a result of Nissan's breach of its express warranty, Plaintiffs and State Subclass Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, and out-of-pocket expenses for maintenance and service that they otherwise would not have incurred but for the Defect.

129.     Nissan was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to Nissan and its authorized dealers, State Subclass Members taking their vehicles to its dealers, and Plaintiffs' demand letters which were sent on May 20, 2019 and November 13, 2019, and this lawsuit.

130.     Plaintiffs and State Subclass Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of Nissan's conduct described herein.

131.     In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Nissan to limit its express warranty in a manner that would exclude or limit coverage for the Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail of its essential purpose. Plaintiffs and State Subclass Members have presented their Class Vehicles to Nissan's authorized dealers on numerous occasions and Nissan has failed to remedy the Defect. As a result, Plaintiffs and State Subclass Members are left with defective vehicles that pose a safety hazard and do not function as intended and, therefore, have been deprived of the benefit of their bargains.

132.     In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Nissan to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. Nissan's warranties were adhesive and did not permit negotiations. Nissan possessed superior knowledge of the Defect, which is a latent defect,

prior to offering Class Vehicles for sale. Nissan concealed and did not disclose this Defect, and Nissan did not remedy the Defect prior to sale (or afterward).

**COUNT V**
**Breach of the Implied Warranty of Merchantability**
**Plaintiffs, Individually and on Behalf of the State Subclasses**

133.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

134.    Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

135.    Nissan is a "merchant" as defined under the UCC.

136.    The Class Vehicles are "goods" as defined under the UCC.

137.    A warranty that the Class Vehicles were in merchantable quality and condition arises by operation of law with respect to transactions for the purchase and lease of Class Vehicles. Nissan impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and the absence of material defects, and that the vehicles would pass without objection in the automotive trade.

138.    The Class Vehicles, when sold and leased, and at all times thereafter, were not in merchantable condition or fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles were not merchantable in that the Defect poses a significant safety hazard and can result in drivers unable to safely drive their vehicles at night. The Defect therefore renders the Class Vehicles unfit to provide safe and reliable transportation.

139.    Nissan was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to Nissan and its authorized dealers, class members

taking their vehicle to its dealers, Plaintiffs' demand letters sent on May 20, 2019 and November 13, 2019, and this lawsuit.

140.     Plaintiffs and the other State Subclass Members have had sufficient direct dealings with either Nissan or its agents, including its authorized dealerships, to establish privity of contract between Nissan on the one hand and Plaintiffs and each State Subclass Member on the other hand. Regardless, privity is not required here because Plaintiffs and each of the State Subclass Members are the intended third-party beneficiaries of contracts between Nissan and its dealers, and specifically of Nissan's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit consumer end-users only.

141.     In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Nissan to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. Nissan's warranties were adhesive and did not permit negotiations. Nissan possessed superior and exclusive knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. Nissan concealed and did not disclose this Defect, and Nissan did not remedy the Defect prior to sale (or afterward).

142.     As a direct and proximate result of the breach of these warranties, Plaintiffs and Class Members were injured and are entitled to damages.

**COUNT VI**
**Violations of Song–Beverly Consumer Warranty Act**
**For Breach of Express Warranty**
**Cal. Civ. Code §§ 1790–1795.8**
**Plaintiff Gonzalez, Individually and on Behalf of the California Subclass Who Purchased**
**or Leased Class Vehicles for Personal, Family, or Household Purposes**

143.     Plaintiff Gonzalez incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

144.     Plaintiff Gonzalez brings this claim individually and on behalf of the California Subclass who purchased or leased a Class Vehicle for Personal, Family or Household Purposes.

145.     Plaintiff and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

146.     The class vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

147.     Nissan is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

148.     Nissan made express warranties to Plaintiff and the California Subclass members within the meaning of Cal. Civ. Code §§ 1791.2 & 1793.2(d).

149.     Nissan breached these express warranties by selling and leasing defective Class Vehicles that required repair or replacement within the applicable warranty period. Despite a reasonable number of attempted repairs, Nissan has failed to adequately repair the Defect.

150.     Nissan has failed to promptly replace or buy back the vehicles of Plaintiff and the proposed California Subclass members as required under Cal. Civ. Code § 1793.2(d)(2).

151.     As a direct and proximate result of Nissan's breach of its express warranties, Plaintiff Gonzalez and the California Subclass members received goods in a condition that substantially impairs their value to Plaintiff and the other Subclass members. Plaintiff and the California Subclass members have been damaged as a result of, *inter alia*, overpaying for the Class Vehicles, the diminished value of the Class Vehicles, the Class Vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

152.    Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff and the California Subclass members who purchased for personal, family or household purposes are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles as well as reimbursement of out-of-pocket expenses incurred as a result of the Defect.

153.    Pursuant to Cal. Civ. Code § 1794(d), (e), Plaintiff and the California Subclass members are entitled to reasonable costs and attorneys' fees.

<u>**COUNT VII**</u>
**Violations of Song–Beverly Consumer Warranty Act**
**For Breach of Implied Warranty**
**Cal. Civ. Code §§ 1790–1795.8**
**Plaintiff Gonzalez, Individually and on Behalf of the California Subclass Who Purchased or Leased for Personal, Family or Household Purposes**

154.    Plaintiff Gonzalez incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

155.    Plaintiff Gonzalez brings this claim individually and on behalf of the California Subclass who purchased for personal, family or household purposes.

156.    Plaintiff and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

157.    The class vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

158.    Nissan is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

159.    Nissan impliedly warranted to Plaintiff Gonzalez and the California Subclass members that Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

39

160. Section 1791.1(a) provides that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods must meet each of the following:

(1) Pass without objection in the trade under the contract description.
(2) Are fit for the ordinary purposes for which such goods are used.
(3) Are adequately contained, packaged, and labeled.
(4) Conform to the promises or affirmations of fact made on the container or label.

161. The Defect in the Class Vehicles is present in them when sold and substantially certain to manifest. The Class Vehicles would not pass without objection in the automotive trade because the Defect causes all or substantially all of the vehicles to experience dangerous dimming of headlights and to fail to operate as intended. The Defect thus affects the central functionality of the vehicle, poses a serious safety risk to drivers and passengers, and causes increased maintenance costs.

162. Because the Defect creates an unreasonable risk to driver and passenger safety, and because the Class Vehicles are unfit for their ordinary purpose due to the Defect, the Class Vehicles are not fit for the ordinary purposes for which such vehicles are used.

163. Class Vehicles are not adequately labeled because the labeling fails to disclose the Headlamp Defect and does not advise the California Subclass members of the Headlamp Defect.

164. Any attempt by Nissan to disclaim its implied warranty obligations under the Song-Beverly Act is ineffective due to its failure to adhere to Sections 1792.3 and 1792.4. Those sections of the Civil Code provide that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must "in simple and concise language" state each of the following: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire risk as to the quality and performance of the goods is with the buyer. (3) Should the goods prove defective

following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair." Cal. Civ. Code § 1792.4(a). Nissan's attempted implied warranty disclaimer does not conform to these requirements.

165.     The Headlamp Defect deprived Plaintiff and the California Subclass members of the benefit of their bargain and have resulted in Class Vehicles being worth less than what Plaintiff and other California Subclass members paid.

166.     As a direct and proximate result of Nissan's breach of its implied warranties, Plaintiff and the California Subclass members received goods that contain a defect that substantially impairs their value. Plaintiff and the California Subclass members have been damaged by the diminished value of the vehicles, the vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

167.     Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and the California Subclass members are entitled to damages and other legal and equitable relief, including, *inter alia*, benefit-of-the-bargain damages, overpayment or diminution in value of their Class Vehicles, and reasonable attorneys' fees and costs.

<u>**COUNT VIII**</u>
**Violations of Florida's Deceptive and Unfair Trade Practices Act**
**FLA. STAT. § 501.201, *et seq*. ("FDUTPA")**
**Plaintiff Suarez Individually, and on Behalf of the Florida Subclass**

168.     Plaintiff Suarez incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

169.     Plaintiff Suarez brings this claim on behalf of the Florida Subclass.

170.     Plaintiff Suarez, and Florida Subclass members are "consumers" within the meaning of FLA. STAT. § 501.203(7).

171.     Nissan engaged in "trade or commerce" within the meaning of FLA. STAT. §

501.203(8).

172.     The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).

173.     Nissan's acts and practices, described herein, are unfair in violation of Florida law because it violates Florida public policy and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

174.     Nissan acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner, in at least the following respects:

    a.     promoted and sold or leased Class Vehicles it knew were defective;

    b.     failed to disclose the Headlamp Defect, and represented through advertising and the Class Vehicles possess particular qualities that were inconsistent with Nissan's actual knowledge of them;

    c.     failed to make repairs or made repairs and provided replacements that caused Plaintiff and the Florida Subclass members to experience repeated instances of failure, rendering the warranties useless; and

    d.     minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers.

175.     The gravity of harm resulting from Nissan's unfair conduct outweighs any potential utility. The practice of selling and leasing defective Class Vehicles without providing an adequate remedy to cure the defect harms the public at large and is part of a common and uniform course of wrongful conduct.

176.     The harm from Nissan's conduct was not reasonably avoidable by consumers. Even after receiving a large volume of consumer complaints, Nissan did not disclose the Defect. Plaintiff Suarez and Florida Subclass members did not know of, and had no reasonable means of discovering, that Class Vehicles are defective.

177.     Nissan also engaged in deceptive trade practices in violation of Florida law, by promoting the safety, convenience, and operability of Class Vehicles while willfully failing to disclose and actively concealing their defective nature.

178.     Nissan committed deceptive acts and practices with the intent that consumers, such as Plaintiff Suarez and Florida Subclass members, would rely upon Nissan's representations and omissions when deciding whether to purchase or lease a Class Vehicle.

179.     Plaintiff Suarez and Florida Subclass members suffered ascertainable loss as a direct and proximate result of Nissan's unfair and deceptive acts or practices. Had Plaintiff and the Florida Subclass members known that the Class Vehicles are equipped with headlights containing the Defect, they would not have purchased and leased the Class Vehicles, or would have paid significantly less for the them. Among other injuries, they overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value.

180.     Plaintiff Suarez and the Florida Subclass members are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and reasonable attorneys' fees under FLA. STAT. § 501.2105(1).

181.     Plaintiff Suarez also seeks an order enjoining Nissan's unfair and deceptive acts or practices pursuant to FLA. STAT. § 501.211, and any other just and proper relief available under the FDUTPA.

<u>**COUNT IX**</u>
**Violations of the Ohio Consumer Sales Practices Act**

## OHIO REV. CODE ANN. §§ 1345.01, *et seq*. ("OCSPA")
## Plaintiff Byrd Individually, and Behalf of the Ohio Subclass

182.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

183.    Plaintiff Byrd brings this claim on behalf of the Ohio Subclass, based upon, *inter alia*, the fact that he purchased his Class Vehicle in the state of Ohio.

184.    Nissan is a "supplier" of Class Vehicles, within the meaning of the OCSPA. *See* OHIO REV. CODE ANN. § 1345.01(C).

185.    The OCSPA is broadly drafted, applying to the sale of consumer goods "to an individual for purposes that are primarily personal, family, or household [uses]." OHIO REV. CODE ANN. § 1345.01(A). Nissan's conduct in this case falls within the scope of the OCPSA.

186.    The OCSPA provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." OHIO REV. CODE ANN. § 1345.02(A).

187.    The OCSPA broadly prohibits unfair, deceptive, and unconscionable practices in consumer sales transactions, including the sale of services. OHIO REV. CODE ANN. § 1345.02(A).

188.    The OCSPA further provides that "a consumer" has a private cause of action for violations of the statute, and expressly allows for class actions. OHIO REV. CODE ANN. § 1345.09.

189.    As detailed herein, Nissan's conduct was unfair, deceptive, and unconscionable.

190.    Nissan acted in the face of prior notice that its conduct was deceptive, unfair, or unconscionable. Material misrepresentations concerning the qualities and performance of Class Vehicles, as well as material omissions concerning the Headlamp Defect, constitute a violation of the statute.

191.    It is also a deceptive act or practice for purposes of the OCSPA if a supplier makes representations, claims, or assertions of fact in the absence of a reasonable basis in fact. *See* OHIO

REV. CODE ANN. § 109:4-3-10(A).

192.     Nissan's actions as set forth above occurred in the conduct of trade or commerce.

193.     The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Nissan detailed in this complaint, including, but not limited to, the failure to honor implied warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases including, but not limited to, the following: *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382); *State ex rel. Montgomery v. Ford Motor Co.* (OPIF #10002123); *State ex rel. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025); *Bellinger v. Hewlett-Packard Co.*, 2002 WL 533403 (Ohio. Ct. App. Apr. 10, 2002) (OPIF #10002077); *Borror v. MarineMax of Ohio*, 2007 WL 431737 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388); *State ex rel. Petro v. Craftmatic Organization, Inc.* (OPIF #10002347); *Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586); *State ex rel. Brown v. Lyons, et al.* (OPIF #10000304); *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427); *Khouri v. Lewis* (OPIF #10001995); *Mosley v. Performance Mitsubishi aka Automanage, Inc.* (OPIF #10001326); *Walls v. Harry Williams d/b/a Butch's Auto Sales* (OPIF #10001524); and *Brown v. Spears* (OPIF #10000403).

194.     As a direct and proximate result of Nissan's violations of the OCSPA, Plaintiff Byrd and members of the Ohio Subclass have been injured and suffered ascertainable loss.

195.     Plaintiff Byrd and the Ohio Subclass members have suffered injuries in fact and actual damages, including but not limited to overpayment for their Class Vehicles and financial losses from the devaluation of their Class Vehicles, all resulting from Nissan's conduct and practices in violation of the OCSPA.

196.     These injuries are of the type that the OCSPA was designed to prevent and are the direct and proximate result of Nissan's unlawful conduct.

**COUNT X**
**Fraudulent Concealment**
**All Plaintiffs, Individually and on Behalf of the State Subclasses**

197.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

198.     Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

199.     Nissan made material omissions concerning a presently existing or past fact in violation of common law. Nissan did not fully and truthfully disclose to its customers the true nature of the Headlamp Defect. A reasonable consumer would not have expected the Defect in a new vehicle and especially not a Defect that poses a serious safety risk and can result in an inability to safely operate the car at night.

200.     Nissan made these omissions with knowledge of their falsity and with the intent that Plaintiffs and State Subclass Members rely upon them.

201.     The facts concealed, suppressed, and not disclosed by Nissan to Plaintiffs and State Subclass Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Class Vehicles or pay a lesser price.

202.     Nissan had a duty to disclose the true quality and reliability of the Class Vehicles because the knowledge of the Defect and its details were known and/or accessible only to Nissan; Nissan had superior knowledge and access to the relevant facts; and Nissan knew the facts were not known to, or reasonably discoverable by, Plaintiffs and State Subclass Members. Nissan also had a duty to disclose because it made many affirmative representations about the qualities and reliability of its vehicles, including references as to safety and general operability, as set forth

above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual reliability of their vehicles.

203.     Had Plaintiffs and the State Subclass Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less in doing so. Thus, Plaintiffs and the other State Subclass Members were fraudulently induced to lease or purchase Class Vehicles, containing the Defect.

204.     Plaintiffs and Class Members reasonably relied on Nissan's material omissions and suffered damages as a result. Nissan's conduct was willful, wanton, oppressive, reprehensible, and malicious. Consequently, Plaintiffs and State Subclass Members are entitled to an award of punitive damages.

## COUNT XI
### Unjust Enrichment
### In the Alternative to All Other Claims
### All Plaintiffs, Individually and On Behalf the State Subclasses

205.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

206.     Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

207.     This claim is pleaded in the alternative to the other claims set forth herein.

208.     As the intended and expected result of its conscious wrongdoing, Nissan has profited and benefited from the purchase and lease of Class Vehicles that contain the Defect.

209.     Nissan has voluntarily accepted and retained these profits and benefits, knowing that, as a result of its misconduct alleged herein, Plaintiffs and the Class were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Nissan had represented and that a reasonable consumer would expect. Plaintiffs and the State Subclass Members expected that

when they purchased or leased a Class Vehicle, it would not contain a Defect that makes the vehicle unreliable and poses a serious safety risk.

210.     Nissan has been unjustly enriched by its deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and unearned monies from Plaintiffs and the State Subclass rightfully belonging to them.

211.     Equity and good conscience militate against permitting Nissan to retain these profits and benefits from its wrongful conduct. They should accordingly be disgorged or placed in a constructive trust so that Plaintiffs and Class Members can obtain restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Classes, respectfully request that this Court:

A.  determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.  appoint Plaintiffs as representatives of the Classes and their counsel as Class counsel;

C.  award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class members are entitled;

D.  award pre-judgment and post-judgment interest on such monetary relief;

E.  award restitution in an amount according to proof;

F.  award Plaintiffs and Class members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.  order such other and further relief as the Court may deem just and proper.

DATED: May 14, 2021

By: _____

John Spragens (TN Bar No. 31445)
SPRAGENS LAW PLC
311 22nd Ave. N.
Nashville, TN 37203
Telephone: (615) 983-8900
john@spragenslaw.com

*Counsel for Plaintiffs and the Proposed Class*

Timothy N. Mathews
Alex M. Kashurba
Samantha E. Holbrook
Zachary P. Beatty
CHIMICLES SCHWARTZ KRINER
 & DONALDSON-SMITH LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
tnm@chimicles.com
amk@chimicles.com
seh@chimicles.com
zpb@chimicles.com

*Counsel for Plaintiffs and Proposed Lead Class Counsel (all* **pro hac vice** *forthcoming)*

49

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

RAFAEL SUAREZ, DAISY
GONZALEZ, and RICHARD BYRD,
individually and on behalf of all
others similarly situated,

        Plaintiffs,

    vs.

NISSAN NORTH AMERICA, INC.,

        Defendant.

No. _____

**JURY TRIAL DEMANDED**

**CLASS ACTION**

## CLRA VENUE DECLARATION OF PLAINTIFF DAISY GONZALEZ PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1780(d)

I, Daisy Gonzalez, have knowledge of the facts stated herein and, if called upon to do so, could competently testify thereto.

2.    I am a Plaintiff in the above-captioned action.

3.    I submit this declaration in support of the Class Action Complaint, which is based in part on violations of the Consumers Legal Remedies Act, California Civil Code section 1750 et seq.

4.    The Class Action Complaint has been filed in the proper place for trial of this action.

5.    I declare under penalty of perjury under the laws of California and the United States that the foregoing affidavit is true and correct to the best of my

H0104795.

1

knowledge, and was executed by me in the city of _Fontana_,

California, on May 1, 2021.



_Daisy Gonzalez_
DAISY GONZALEZ

Case 3:21-cv-00393   Document 1   Filed 05/14/21   Page 51 of 51 PageID #: 51